STATE OF TENNESSEE *v.* J. E. RUST and others.

## April Term, 1878.

TREASURER OF THE STATE — RECEIPTS AND PAYMENTS — BREACH OF OFFICIAL DUTY. — Under the provisions of the Code regulating the payments out of and into the state treasury, it is a violation of the treasurer's duties and a breach of his official bond to pay out funds in the state treasury without a warrant from the comptroller authorizing the payment, and to receive in exchange coupons of the bonds of the state, without a warrant from the comptroller authorizing him to receive them.

SAME — OFFICIAL BOND — RELEASE OF SURETIES BY LOSS OF FUNDS ATTACHED. — If the state, after having, in a suit against a late treasurer and his sureties, attached funds, consisting of state coupons a:.d state bonds, in the hands of the treasurer as its property, take no steps to have the funds brought into court, and sanction, though under a mistake of facts, the withdrawal of part of those funds by the principal, the sureties ought to be released to the extent of the funds abstracted; but if the funds have been used to pay off encumbrances on land conveyed by the principal in trust for his sureties, the state will be entitled to follow the funds, and have priority of satisfaction out of the lands to the extent of the funds thus used.

SAME — SAME — LEGISLATIVE SETTLEMENT. — A settlement made by a committee of the Legislature with an outgoing treasurer will not release the sureties, if the treasurer do not pay over to his successor, as required by his bond, the funds found in his hands; nor, *à fortiori*, if the settlement be incomplete.

SAME — SAME — JOINT LEGISLATIVE RESOLUTION TO BURN NOTES. — A joint resolution of both houses of the Legislature, introduced before, but not passed until after, the expiration of the term of office of an outgoing treasurer, providing that certain bank-notes in his hands shall be burned before they are turned over to his successor, and appointing a committee for that purpose, will not release the sureties from liability for funds not paid to his successor at the expiration of the term of office, as required by the stipulations of the official bond.

*J. G. Wallace*, for complainant.

*East, Gaut, Lawrence, Ruhm, Campbell*, and *Fare*, for defendants.

THE CHANCELLOR : — Bill filed, on July 18, 1871, against J. E. Rust, as the late treasurer of the state of Tennessee, and the other defendants as sureties on his official bonds, a second bond having been given upon the application of

a surety to be released under the statute, for an account,. and to recover sums of money alleged to be due the state by reason of official defalcations. Under this bill, a tin box, containing coupons of bonds of the state, and other assets, was attached, upon the ground that the coupons and other assets were either the property of the state, or deposited with one of the sureties for the indemnity of the sureties. An amended bill was afterwards filed to reach certain realty conveyed by the defendant Rust, in trust to secure his said sureties from all liability by reason of their suretyship. The defendants have answered, proof has been taken, and the case is now before me on final hearing, having been argued with marked ability on both sides.

The defendant Rust qualified as treasurer of the state by giving bond, on November 24, 1868, and he went out of office on June 1, 1870, when his successor took his place. He admits, and the proof shows, that on that day there was due from him to the state, —

Balance on general account.............................................$61,398 16
By overchecks paid by his successor................................. 10,153 49

It seems that he had also received from an attorney of the state at Memphis, with which he had never charged himself, the sum of $4,118.62, out of which he had paid the lawyer's fee in the matter of the collection, and made other payments authorized by law, whereby the sum was reduced to $1,507.82. He claims that he is also entitled to a credit for personal expenses and clerk hire to an amount exceeding this balance, necessarily incurred in and about the business in which this fund originated, which business did not pertain to the duties of his office, but was thrown upon him by an act of the Legislature. Upon examination, I think the credit for personal expenses fairly made out; and although the claim for clerk hire is not sustained by any law, and, strictly speaking, is inadmissible, yet, the necessity of some clerical assistance, owing to his forced

absences thereby occasioned, is reasonably established. I am of opinion that while the claim beyond the amount of the fund received cannot be entertained, it should be allowed to the extent of that fund.

The defendant does not controvert his liability for the $10,153.49 of overchecks, with interest. Nor does he deny his liability for the general balance of $61,398.16. He insists, however, that this balance was, at the time, in his hands in the shape of coupons of bonds of the state of Tennessee, held by him as treasurer, and which he tendered to a committee of the Legislature in satisfaction of such balance. He acknowledges, in his deposition, that $25,000 of these coupons were taken by him from a third person, at par, for an equal amount of the issues of the Bank of Tennessee in his hands as treasurer. He further admits the receipt of coupons to the nominal amount of $1,800 from another person, for which he paid, out of the treasury of the state, the like sum of $1,800 in United Sates legal-tender notes. He concedes that he bought other coupons in the same way, without being able to give the amounts. The remaining coupons, he says, were taken by him from the collectors of the public revenue, who, having settled with the comptroller, were directed to pay balances into the treasury. He says, however, that the payable warrants of the comptroller, on which these coupons were received, were directions to pay in dollars, not in coupons, and that the comptroller refused to give him a receivable warrant for the coupons thus taken. By the Code, sec. 207, it is provided, in subsection 10, that the comptroller shall keep a regular account with every person in the state authorized to collect revenues, charging him with all sums received, and crediting him with all sums paid into the treasury, for which he produces and files with the comptroller the treasurer's duplicate receipts. And in subsection 40, it is further provided that the payment into the treasury, by revenue collectors, of depreciated paper re-

ceived by them, without fault on their part, shall be made under the comptroller's warrant. And by subsection 1, it is made the duty of the comptroller to examine and adjust all accounts and claims against the state which are, by law, to be paid out of the treasury. By the Code, sec. 234, the treasurer of the state is expressly forbidden to pay out any money, except the salary of the comptroller, but on the warrant of the comptroller. These provisions were intended to furnish the comptroller's office with evidence of all funds paid into the treasury. They are positive requirements, and not unmeaning forms. *Wood* v. *The State*, 8 Heisk. 329. The defendant Rust admits that he received all of the coupons in question without any receivable warrant of the comptroller authorizing their payment into the treasury, and that he paid out the United States currency and the issues of the Bank of Tennessee, as aforesaid, without a payable warrant from the comptroller. It is too clear for argument, that these acts were all plain violations of official duty, and breaches of the treasurer's official bonds. The defendant Rust and his sureties are liable to the state for the funds which, except for these acts, would have been in the treasury, namely, the sum of $25,000 in Bank of Tennessee notes, and the sum of $36,398.15 in United States currency. Being an express trustee, Rust would probably be liable, at the election of the state, for the value of the issues of the Bank of Tennessee when wrongfully used, or for an amount in money sufficient at this time to replace these issues. *Jameson* v. *Shelby*, 2 Humph. 198; *Jones* v. *Harrison*, 3 Hayw. 92; *Robinson* v. *Harrison*, 2 Tenn. Ch. 14; *Earl of Powlet* v. *Herbert*, 1 Ves. jr. 297; *Forrest* v. *Elwes*, 4 Ves. 497. It is perhaps not material to determine this point in the present case, for under the peculiar circumstances presently to be noticed, and in view of the fact that the Bank of Tennessee notes, and the coupons taken for them, were at the time about equal in value, and that the coupons

to that amount are still on hand, in the control of the court, I think it equitable to extinguish the liability of the defendants to this extent by an equal amount of the coupons, dollar for dollar, the interest on the one being equivalent to the interest on the other. I am the more willing to come to this conclusion because the state has, by its attorney, entered into an agreement with the defendants, embodied in a decree in this cause on December 18, 1878, "that for any judgment the state may recover against the defendants, or any of them, the bonds or coupons of the state of Tennessee will be received and accepted, at par value, in satisfaction thereof, and that any or all of the parties may at any time before judgment pay into the office of the master of the court such amounts, in bonds and coupons, as they choose, for which they shall receive a credit at their par value." This agreement is, under the circumstances of this case, equitable and just, and meets the decided approval of the court. For, although the defendant Rust was clearly wrong in his construction of his powers as treasurer, it does not appear that he was actuated by any improper motives, and the facts, as they now appear, were admitted by him from the very first; and he actually had, at the dates of his settlement with a committee of the Legislature, state bonds and coupons sufficient to cover his defalcation, and which he tendered to the committee. The tender was not good in law, being made neither in the right funds nor to the right party, but it was evidence of good faith; and if the state had simply impounded the funds thus tendered, and sought a decree only for what it was justly entitled to claim, the loss on the sureties would have been a mere trifle. The litigation has been disastrously protracted by the state demanding more than it was justly entitled to, and the agreement is only a fair equivalent for the losses occasioned by suspicions not borne out by the facts, and the necessary delays of the suit. The funds in the tin box attached in this cause were the funds of the state, if it

chose to ratify the acts of Rust in receiving them. They were the funds of Rust, pledged for the indemnity of his sureties, if the state chose to contend for its strict legal rights. In the first view, they would go, so far as they still exist, to extinguish the state's demand, dollar for dollar. In the second view, they may be treated as a payment, at their par value, of so much of the recovery; and inasmuch as they carry interest, as negotiable securities, the payment would be of the original liability, the interest on the one side being set off by the interest on the other. The master's report shows that there are now in the box, —

| | |
|---|---:|
| State coupons | $26,975 00 |
| State bonds | 3,000 00 |
| Bank of Tennessee notes | 2,296 00 |
| | $32,271 00 |

And I am of opinion that the liability of the defendants on the general account should be extinguished by the nominal amount of these assets, to be turned over to the state, interest being set off against interest. The other assets in the box, if of any value, may be sold or collected, and proceeds applied to the satisfaction of the decree to which the state is clearly entitled as against the defendant Rust for the balance of the $61,398.16 and the $10,153.49, with interest from June 1, 1870.

At the time the tin box was impounded by the attachment sued out by the state in this cause, it contained a much larger amount of bonds and coupons, principally coupons, than now remains in it. Assets were withdrawn from the box by Rust after it had been attached, and used for his own purposes. Of the funds thus withdrawn, coupons to the nominal amount of $26,300 were sold, and the proceeds used in the payment of taxes and purchase-money due upon a tract of land conveyed by Rust in trust to secure his sureties as treasurer, and which land is sought to be subjected to the satisfaction of the state's demand under the

supplemental and amended bill in this cause.   All the facts touching the withdrawal and disposal of these funds are shown in *The State* v. *Rust and others*, 2 Tenn. Ch. 181, which was a proceeding by attachment of the person to punish the persons implicated in the substraction.   Of course, the state is now entitled to a decree against Rust and the defendant Ogden, one of his sureties, who concurred in the violation of the attachment, and any other of the sureties cognizant at the time of such violation, for the amount of the original liability which would have been extinguished by these funds.   But the other sureties occupy a different position as to these funds.   They had been impounded by the state for its indemnity, and the state, having secured a positive lien thereon by the attachment, even if not bound to active diligence in preserving the fund by the prompt appointment of a receiver, was certainly required not to abandon the lien thus obtained.  *Watson* v. *Read*, 1 Tenn. Ch. 196.   The record shows that the attorney of the state was thrown off his guard, and induced to suspend active proceedings to secure the delivery of the funds into court, by the repeated assurances of the counsel of Rust, who also for a time undertook to act as counsel for the sureties, but without authority, that the box was under the control of the sureties, and that Rust would not be allowed access to it.   He admits that the same counsel did inform him, at one time, that Rust and his sureties had used a portion of the coupons in making a payment on the land, and that, misled by the assurances of the counsel, he acquiesced in the transaction.   It was not until the October term, 1874, of this court, and after over one-half of the funds in the box had been abstracted, that the attorney for the state took any active step to impound the remaining funds and to punish the violations of the attachment.   Under these circumstances, I do not think the loss of these funds ought to fall on those of the sureties who were innocent of any participation in these proceedings.   They ought to be released to the extent of the damage sustained,

and this,. under the agreement between the parties, would be the nominal amount of the funds abstracted. It is, at least, doubtful whether the counsel of the state can be considered as in any fault as to the first abstraction from the box, which occurred very soon after the bill was filed. Under these circumstances, although the entire abstractions exceed nominally the balance against the sureties on the general account, I will limit the credit to be given them to this balance, setting off interest against interest. This will leave them liable only for the $10,153.49 overchecks, with interest. But, if they are released from liability to the extent of the funds in question, it is clear that the state ought to be entitled to follow those funds into the property in which they were vested. These funds, to the extent of $26,300 of coupons, were used in the payment of the purchase-money for, and taxes on, the lands constituting the home-place of Rust, and included in the deed of trust for the benefit of the sureties. The state will be decreed entitled to a prior lien on this land over the sureties to the extent of the funds thus used, with interest; and as the sureties get a credit for the nominal amount thereof, with interest from June 1, 1870, the subrogation of the state will be to the full extent of the credit thus allowed the sureties.

The sureties contend that they were released by a settlement made by Rust, as treasurer, with a legislative committee appointed under the Code, sec. 223. That section provides that, previous to the election of a treasurer, the Legislature shall carefully examine the accounts and vouchers, and settle with the incumbent. The journals of the Senate and House of Representatives show that, in view of the election of a new treasurer, a committee was appointed to settle with Rust, and that the committee reported their action on May 18, 1870. That action was, that, "from an examination of the books of the comptroller and treasurer, and a statement of the treasurer," they found debits of certain items, and credits of certain items, the two exactly

balancing, as was to be expected in a proper set of books; but they add, "that, owing to the limited time allowed before the day fixed for the election [of the treasurer], we were unable to count separately each package of money and coupons now on hand, and would, therefore, respectfully recommend that a special committee be appointed, whose duty it shall be to make a correct count of all money and coupons now on hand." In other words, the committee appointed to "carefully examine the accounts and vouchers, and settle with the incumbent," report that, for want of time, they did not examine the accounts and vouchers, nor make a settlement. Of course, whatever may be the effect to be given to a settlement by a legislative committee with a public officer, it is clear that the effect cannot follow where there has been no settlement at all. Besides, the committee was not authorized to receive the funds which were in the treasurer's hands, and the settlement, if made, would have amounted to nothing, if, in fact, on June 1, 1870, the out-going treasurer did not turn over to his successor in office, as required by law and the terms of his bond, all books, papers, moneys, and funds in his hands, and the defendant admits that he was indebted on that day to the state of Tennessee the balance on general account, and the over-checks as aforesaid. Moreover, the latter item, the correct-ness of which is conceded, grew up out of payments made by Rust's successor in office, some of which were credited to him on the books, without having been paid by him, at the date of the supposed settlement with the legislative committee, and some were drawn afterwards, between May 18 and 31, 1870, in due course of business. And it is this overcheck item with which I have alone charged the sureties.

The sureties also contend that they have been released by an extension of the time, by the Legislature, within which their principal was required by law to pay over the funds in his hands. The law and the official bond required the treasurer to "safely deliver to his successor in office all

books, moneys, vouchers, accounts, and effects belonging to his said office." Part of the effects in his hands at the time of the report of the legislative committee consisted of over $300,000 of Bank of Tennessee notes. On May 26, 1870, a joint resolution was introduced in the Senate, reciting that the present treasurer was about to retire from office, and had in his hands $315,000 of the issue of the Bank of Tennessee, and providing for the appointment of a committee to burn this money, and resolving " that said money shall be burned at once, before the same shall pass into the hands of the incoming treasurer." This joint resolution did not, it seems, finally pass until June 3, 1870, and the money was afterwards burned, a report of the fact being made on the 14th of the month. The argument is, that this resolution operated an extension of the time within which their principal was previously required to pay over the money, and that the sureties were thereby released. There is nothing on the face of the resolution directly extending the time of settlement, nor showing an intention of so doing. The date of the introduction of the resolution is persuasive that the expectation was that it would pass in time to secure the burning of the notes before the new treasurer went into office. The resolution not having been passed before the 1st of June, there was nothing to prevent the outgoing treasurer from paying the funds in his hands to his successor. The mere fact that, out of courtesy to the Legislature, he did not pay it to his successor, can no more release his sureties than his failure to deliver the coupons or pay over other moneys with which he was charged. Although it has been held that the sureties of an officer are released by special act of the Legislature giving time to the officer to collect and account for taxes (*Johnson* v. *Hacker*, 8 Heisk. 388), it can hardly be maintained that they are released without any act, or even resolution, actually passed at the time when the sureties' liability became absolute.

The breach of the treasurer's bonds, so far as the item of overchecks is concerned, having occurred at the expiration of his term of office, the sureties on his first bond, except Yarborough, who was released, and the sureties on the second bond would all be equally bound for the recovery. *Odom* v. *Owen*, 2 Baxt. 446. The property in the trust assignment for the benefit of the sureties may be sold, and the proceeds applied to the satisfaction of the recovery, the state being, however, entitled to the proceeds of the home tract, in the first instance, as hereinbefore declared. The costs will be paid out of the funds in court, but the complainant will have a decree over against the defendants for the same.